UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| DEBORAH R. BIGGS,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL,[1] Commissioner of Social Security,<br><br>    Defendant. | Case No. 2:18-cv-00086<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

Plaintiff Deborah R. Biggs seeks judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. (Doc. No. 1.) Now before the Court is Biggs's motion for judgment on the administrative record (Doc. No. 11), to which the Commissioner has responded in opposition (Doc. No. 16). Having considered these filings and the administrative record as a whole (Doc. No. 7), and for the reasons given below, the Magistrate Judge will recommend that Biggs's motion be denied and that the Commissioner's decision be affirmed.

---

[1]     Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as the defendant in this action. Fed. R. Civ. P. 25(d).

## I. Background

### A. Biggs's Application for DIB

Biggs applied for DIB on September 30, 2014.[2] (AR 15, 65, 206–12.) She alleged that, since April 29, 2014, she has been disabled due to rheumatoid arthritis, high blood pressure, high cholesterol, and bowel obstruction. (AR 65, 231–44.) The Commissioner denied Biggs's application initially and on reconsideration. (AR 65–83.) Biggs requested a hearing before an administrative law judge (ALJ), which was held by video on February 27, 2018. (AR 30–64, 100–01.) Biggs appeared in Cookeville, Tennessee, represented by counsel, and the ALJ presided over the hearing from Knoxville. (AR 30–64.) The ALJ also heard testimony from Dr. James D. Flynn, a vocational expert. (AR 58–63.)

On April 9, 2018, the ALJ issued a written decision finding that Biggs had not been disabled from the alleged onset date of April 29, 2014, through the date of the decision. (AR 15–24.) In reaching that conclusion, the ALJ made the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since April 29, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: rheumatoid arthritis, obesity and osteoarthritis of the knees, shoulders and back (20 CFR 404.1520(c)).

\*   \*   \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

---

[2] The Transcript of the Administrative Record (Doc. No. 7) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

* * *

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift and carry, push and pull 20 pounds occasionally and ten pounds frequently. The claimant can sit six hours of an eight-hour day and stand and/or walk for two hours of an eight-hour day. The claimant can frequently reach overhead, handle and finger, bilaterally. The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl.

* * *

6. The claimant is capable of performing past relevant work as a Caseworker supervisor, and Marriage and Family Counselor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

* * *

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 29, 2014, through the date of this decision (20 CFR 404.1520(f)).

(AR 17–24.) In crafting Biggs's residual functional capacity (RFC), the ALJ gave little weight to the opinion of Dr. Stephen Clark, Biggs's primary care physician, that Biggs would be absent from any job about four times per month and would need unscheduled breaks every two hours. (AR 23.)

The Social Security Appeals Council denied Biggs's request for review on August 10, 2018, rendering the ALJ's April 9, 2018 decision the final decision of the Commissioner. (AR 1–5.)

    **B.**     **Appeal Under 42 U.S.C. § 405(g)**

Biggs timely filed this civil action for review of the ALJ's decision on October 3, 2018 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g). Biggs argues that the ALJ improperly analyzed her pain symptoms and should have given greater weight to certain parts of Dr. Clark's opinion. (Doc. No. 12.) The Commissioner responds that the ALJ followed applicable

regulations and that substantial evidence supports the ALJ's decision. (Doc. No. 16.) Biggs did not file a reply.

### C. Review of the Record

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the record will only be discussed to the extent necessary to address the parties' arguments.

## II. Legal Standard

### A. Judicial Review of Social Security Appeals

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405–06 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

### B. Administrative Evaluation of Disability Claims

Biggs applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Biggs must establish that she had a disability on or before the last date she was eligible for insurance under Title II, which is determined based on her earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the Social Security Administration that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d

at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:17-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted by* 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.'" *Combs*, 459 F.3d at 643 (alterations in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). If the claimant's residual functional capacity (RFC) permits her to perform past relevant work, she is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

### III.   Analysis

Biggs raises two arguments on appeal. First, Biggs argues that the ALJ erred in analyzing her pain symptoms. Second, she argues that the ALJ erred by failing to adopt Dr. Clark's opinion

that, if Biggs were to return to work, she would be absent four times a month and would need breaks every two hours. Neither of these arguments has merit.

### A. Biggs's Pain Symptoms

To determine whether an individual is disabled, an ALJ must "consider all of the individual's symptoms"—namely, the individual's own description of his or her impairments—and "the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016); *see also* 20 C.F.R. § 404.1529(a). A two-step evaluation process applies to claims of disabling pain. SSR 16-3P, 2016 WL 1119029, at *2; *Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 449 (6th Cir. 2017). The ALJ must first decide whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce [the] individual's symptoms, such as pain." SSR 16-3P, 2016 WL 1119029, at *2. If so, the ALJ must analyze the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id.* Factors relevant to that analysis include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7; *see also* 20 C.F.R. § 404.1529(c)(3).

An ALJ's findings with respect to an individual's symptoms receive "special deference." *Biestek*, 880 F.3d at 788 (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "As long as the ALJ cited substantial, legitimate evidence to support [her] factual conclusions, [the Court is] not to second-guess . . . ." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). However, the ALJ may not "cherry-pick[ ] select portions of the medical record to discredit [the claimant's] complaints of pain." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013).

The ALJ provided the following summary and analysis of Biggs's testimony regarding her pain:

> The claimant testified that she was unable to perform work activities because of her symptoms of pain with a decreased ability to grip in her hands, and shoulders. She had hip pain when she climbed stairs. She felt exhausted most of the time with little stamina. She took naps during the day. She felt that she was in a brain fog most of the time. She had constant symptoms of pain and muscle spasms. The claimant described similar limitations in a Function Report completed by her husband on her behalf (Exhibit 3E).
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the record shows that the claimant's symptoms were controlled with treatment.
>
> There is evidence that the claimant has not been entirely compliant in following doctor's instructions, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application. The claimant continued to smoke one pack of cigarettes each day, despite instructions from her providers to cease (Exhibits 3F, 6F, 9F, 11F, 12F, 14F, 18F, 24F and 28F).

8

Case 2:18-cv-00086   Document 17   Filed 01/28/20   Page 8 of 18 PageID #: 890

The claimant was **obese** at times. The claimant gained weight after the removal of her lap band in 2014 coupled with her increased use of steroids to control her pain symptoms. She had a weight of 213 pounds with a height of five feet nine inches, with a body mass index (BMI) of 31 (Obese Class 1) in April 2015 (Exhibit 8F). The claimant weighed only 180 pounds with a BMI of 26 (Overweight) in January 2015 (Exhibit 15F). In September 2015, the claimant was up to 225 pounds with a BMI of 33 (Exhibit 11F), up to 252 pounds with a BMI of 37 (Obese Class 2) in December 2015, and at 270 pounds with a BMI of 40 (Obese Class 3: Morbid Obesity) in June 2016 (Exhibit 12F).

The claimant self-referred herself for bariatric surgery in August 2016, after failing trials of various weight loss programs (Exhibit 15F). She had a normal gait and was able to stand without difficulty. Dr. Huddleston requested approval from the claimant's insurance company to perform a sleeve gastrectomy in October 2016. The claimant decided against her scheduled January 2017 bariatric surgery (Exhibit 18F). The claimant had a weight of 256 pounds, with a BMI of 38 in July 2017 (Exhibit 24F).

The claimant's symptoms from **rheumatoid arthritis and osteoarthritis** were controlled with treatment, that did not include narcotic pain medication. The claimant's symptoms from arthritis were initially treated with Tylenol in 2014 (Exhibit 1F). The claimant reported to Dr. Clark that she only experienced breakthrough pain three to four days after taking her methotrexate (Exhibit 6F). She reported less left hip pain in September 2014. Dr. Clark treated the pain with injections. In April 2015, the claimant reported to Dr. Clark of worse arthritic pain in the morning (Exhibit 8F). The claimant complained of sleep problems in January 2016 (Exhibit 14F).

The claimant gave rheumatologist Sivalingam Kanagasegar, M.D. a history of migratory arthropathy involving her bilateral shoulders, elbows, wrists, hand and knees for two years in April 2015 (Exhibit 9F). She reported no pain or stiffness in the morning, but only in the evening. On exam, she had full range of motion in her spine and joints with no swelling or tender points for fibromyalgia. With an initial diagnosed [sic] of arthralgias and fatigue, Dr. Kanagasegar prescribed prednisone, which was helpful in reducing the pain in all joints within a month. The claimant complained of increased pain in her left shoulder and thumb that was treated with Gabapentin in September 2015 (Exhibit 11F). In December, she complained of muscle pain in her extremities unrelated to activity that was helped with Sulfasalazine, Ibuprofen and Aleve (Exhibit 12F). Her left thumb was swollen and tender. He added meloxicam, cyclobenzaprine and a short course of prednisone. The claimant was tender and swollen in her right wrist, left hand and left thumb in June 2016 and Methotrexate injections were started. Dr. Kanagasegar noted in September 2016, that the claimant had arthralgia symptoms, although the arthritis profile was negative. Dr. Kanagasegar suspected that the claimant could have seropositive rheumatoid arthritis.

9

> By December 2016, she was treated for rheumatoid arthritis with rheumatoid factor of unspecified site without organ or system involvement (Exhibits 17F, 22F, 25F and 26F). The claimant had increased arthritic pain in her hands and feet, especially her feet. She experienced no falls. She still have [sic] full range of motion in all joints, with a swollen and tender right wrist and left thumb. He treated her with a short course of prednisone and adjusted her other medications. In March 2017, she had intermittent pain around the left heel. When she had pain flare-ups, she lay down for a couple of days. She reported a fall. In November 2017, Dr. Kanagasegar found tenderness in the lumbar spine and her right straight leg raises were positive (Exhibit 27F). Her thumbs were swollen, but not tender. Her right wrist was swollen and tender. The claimant started Humira later in the month, and reported in January some improvement in her pain symptoms (Exhibit 28F).
>
> A magnetic resonance imaging (MRI) of the lumbar spine dated January 2014 revealed multilevel spondylosis and left paracentral disc extrusion at L5-S1 with superior migration with possible impingement of the left L5 nerve root and possibly S1 nerve root (Exhibit 14F). September 2016 x-rays of the claimant's bilateral feet, bilateral hands, bilateral wrists and bilateral knees were within normal limits (Exhibit 13F). X-rays of the claimant's right shoulder dated January 2017 revealed degenerative changes in the acromioclavicular joint and mild degenerative changes involving the glenohumeral joint (Exhibit 20F). X-rays of the lumbar spine dated January 2017 revealed dextroscoliosis at the thoracolumbar junction and mild degenerative disc and facet changes. X-rays of the right foot in May 2017, revealed a mild bunion deformity.

(AR 20–22.)

This thorough analysis belies Biggs's unsupported claim that the ALJ "summarily discussed [her] pain and her statements about the intensity, persistence and limiting effects of her pain." (Doc. No. 12, PageID# 861.) The ALJ's analysis covered significant ground, summarizing Biggs's testimony regarding her pain, her treatment with Dr. Clark and Dr. Kanagasegar (AR 20–22), the results of several imaging studies (AR 22), and her history of obesity and smoking (AR 21). Biggs does not argue that the evidence that the ALJ cited is not substantial or legitimate; instead, she cites a December 4, 2014 laparoscopy and bowel resection to remove a partial small bowel obstruction, the X-rays of her right shoulder and spine performed on January 17, 2017, and Dr. Kanagasegar's "aggressive[ ]" treatment of her arthritis to support the conclusion that her

"conditions have combined to cause severe pain for [her] that will no longer allow her to perform substantial gainful activity."[3] (Doc. No. 12, PageID# 862.)

This Court cannot "reverse a decision supported by substantial evidence, even if [the Court] might have arrived at a different conclusion." *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 391 (6th Cir. 2005). Biggs has not shown that the evidence she cites—all of which the ALJ discussed—supports a different finding with respect to her symptoms of pain. The Commissioner rightly points out that the December 4, 2014 surgical procedure was successful and that Biggs recovered quickly. (Doc. No. 16.) The ALJ noted that, two weeks after the procedure, Biggs "reported to the surgeon that she was doing well, with no recent complaints, was eating well and her bowels were moving." (AR 18.)

---

[3] Biggs also makes passing reference to pain associated with "fibromyalgia[.]" (Doc. No. 12, PageID# 861.) Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). "Unlike other medical conditions, fibromyalgia is not amenable to objective diagnosis and standard clinical tests are 'not highly relevant' in diagnosing or assessing fibromyalgia or its severity." *Lawson v. Astrue,* 695 F. Supp. 2d 729, 744 (S.D. Ohio 2010) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). That said, the presence of a sufficient number of symmetrical "tender points" during a physical examination may support a diagnosis of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *3.

Although Dr. Clark diagnosed Biggs with fibromyalgia in 2016, the ALJ gave that diagnosis little weight "because it [was] inconsistent with the treatment notes of rheumatologist Dr. Kanagasegar[,]" which did not document tender points in 2015 or 2016. (AR 22.) Biggs does not acknowledge the ALJ's finding with respect to fibromyalgia or develop any argument as to why it was incorrect. Accordingly, Biggs has waived any argument regarding the ALJ's analysis of Dr. Clark's fibromyalgia diagnosis. *See Williamson v. Comm'r of Soc. Sec.*, No. 1:14-cv-731, 2016 WL 255033, at *4 (S.D. Ohio Jan. 20, 2016) (concluding that plaintiff waived argument pertaining to diagnosis of fibromyalgia by referencing that "diagnosis in a perfunctory way in her statement of errors" and not "present[ing] any arguments related to [the ALJ's] findings"), *report and recommendation adopted by* 2016 WL 1178011 (S.D. Ohio Mar. 28, 2016); *Hakkarainen ex rel. Blanton v. Astrue*, No. 1:10-cv-2463, 2012 WL 398595, at *10 n.8 (N.D. Ohio Jan. 19, 2012) (finding that plaintiff's one sentence claim that the ALJ had overlooked the plaintiff's diagnosis of fibromyalgia at several steps of the relevant analysis amounted to waiver of the issue), *report and recommendation adopted by* 2012 WL 396970 (N.D. Ohio Feb. 7, 2012).

With respect to Biggs's arthritis, the ALJ discussed the X-rays that Biggs cites—which showed degenerative and mild degenerative changes (AR 739–40)—as well as her treatment history with Dr. Kanagasegar. Whether that treatment is characterized as aggressive or conservative, the ALJ found that it controlled Biggs's symptoms, and the treatment notes that Biggs cites are consistent with the ALJ's conclusion. (Doc. No. 12.) On April 16, 2015, Biggs saw Dr. Kanagasegar and complained that the methotrexate she was taking was not helping her pain.[4] (AR 603.) Dr. Kanagasegar prescribed one dose of prednisone.[5] (AR 604.) When Biggs returned for a follow-up on May 14, 2015, "[s]he stated that the Prednisone really helped" and that, "[w]henever she took [it,] the pain [was] almost gone."[6] (AR 614.) On September 2, 2015, Biggs stated that the pain in her left shoulder and left thumb was a five out of ten. (AR 626.) She continued to report that "Prednisone usually help[ed], especially when she took 10 mg" and that she thought that "Sulfasalazine [was] helping the stiffness," although she still had pain.[7] (*Id.*) On

---

[4] "Methotrexate is one of the most effective and widely used medications for treating rheumatoid arthritis (RA) and other inflammatory types of arthritis." *Methotrexate: Managing Side Effects*, Arthritis Foundation, https://www.arthritis.org/living-with-arthritis/treatments/medication/drug-types/disease-modifying-drugs/methotrexate-side-effects.php (last visited Dec. 17, 2019).

[5] "Prednisone is a steroid used to treat inflammatory types of arthritis, such as rheumatoid and psoriatic arthritis, lupus and polymyalgia rheumatic." *Prednisone*, Arthritis Society, https://arthritis.ca/treatment/medication/medication-reference-guide/medications/prednisone (last visited Dec. 17, 2019).

[6] According to Dr. Kanagasegar's notes, "Prednisone is a great medicine for [Biggs]." (AR 633.) On March 21 and June 21, 2016, Biggs reported that prednisone usually helped reduce her pain. (AR 632, 635.) On December 21, 2016, despite an increase in arthritic pain over the prior three months, Biggs stated that, "[w]hen she took Prednisone, she felt better." (AR 714.) Dr. Kanagasegar administered a short course of prednisone in September 2017. (AR 797.) On November 9, 2017, Biggs stated that, "[w]hile she was taking Prednisone she felt a lot better." (AR 806.)

[7] "Sulfasalazine is a type of drug known as a disease-modifying anti-rheumatic drug (DMARD)" that can be used to treat rheumatoid arthritis. *Sulfasalazine*, Versus Arthritis,

September 22, 2017, Biggs reported increasing pain in her hands, wrists, neck, and shoulders, but overall, her pain was "moderate[,]" and she reported that her "[l]ower back pain [was] a lot better with Gabapentin."[8] (AR 796.) Dr. Kanagasegar stated that if Biggs's joint symptoms improved by her next appointment, he would consider adding "anti-TNF therapy[.]"[9] (AR 797.) Biggs started the anti-TNF drug Humira[10] on November 30, 2017. (AR 803–04.)

The ALJ cited "substantial, legitimate evidence" to support her finding that Biggs's pain was not as limiting as alleged because it was controlled with treatment, *Ulman*, 693 F.3d at 714, and the evidence that Biggs cites is consistent with that finding. The ALJ's conclusion regarding Biggs's pain is thus supported by substantial evidence.

### B. Dr. Clark's Opinion

As Biggs's primary care physician, Dr. Clark treated her for various conditions between August 2014 and January 2018. (AR 23, 502, 809.) On January 10, 2017, Dr. Clark completed a medical source statement of Biggs's ability to do work-related activities. (AR 708–10.) Dr. Clark

---

https://www.versusarthritis.org/about-arthritis/treatments/drugs/sulfasalazine/ (last visited Dec. 17, 2019).

[8] "Gabapentin is an anti-epileptic drug, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." *Gabapentin*, https://www.drugs.com/gabapentin.html (last visited Dec. 17, 2019).

[9] "TNF inhibitors are a group of medications used worldwide to treat inflammatory conditions such as rheumatoid arthritis . . . . They reduce inflammation and can stop disease progression by targeting an inflammation-causing substance called Tumor Necrosis Factor (TNF)." *TNF Inhibitors*, Am. Coll. of Rheumatology, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/TNF-Inhibitors (last visited Dec. 17, 2019).

[10] *See Info. on Tumor Necrosis Factor (TNF) Blockers (marketed as Remicade, Enbrel, Humira, Cimzia, and Simponi)*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-tumor-necrosis-factor-tnf-blockers-marketed-remicade-enbrel-humira-cimzia-and-simponi (last visited Dec. 17, 2019) (explaining that Humira is a type of TNF blocker).

opined that Biggs could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand and/or walk at least two hours in an eight-hour workday. (AR 708.) Dr. Clark further opined that Biggs would need to elevate her legs with prolonged sitting and that she should avoid even moderate exposure to pulmonary irritants, including fumes, odors, dusts, and gases. (AR 709–10) Finally, Dr. Clark opined that Biggs would need to take unscheduled breaks every two hours and that she was likely to be absent from work about four times per month as a result of her impairments. (AR 709.)

> The ALJ provided the following analysis of Dr. Clark's opinion:
>
> Stephen Clark, M.D. opined on January 10, 2017 that the claimant would be absent from work four times a month as a result of her impairment or treatment, she would need breaks every two hours and had pulmonary limitations (Exhibit 16F). The undersigned assigned little weight to the opinion because it was extreme and not supported by the record as a whole. The claimant smoked one pack of cigarettes each day, so pulmonary limitations were not warranted. There was no evidence in the record to support the requirement of a break every two hours or the need to elevate her legs. However, great weight was assigned to the lift, stand and walk limitations because they are consistent with the treatment notes and the residual functional capacity. Dr Clark in [sic] an internist. He provided primary care for the claimant since September 2014. He provided routine prescription refills and managed her care with specialists.

(AR 23.)

Biggs argues that the ALJ erred by "fail[ing] to give great weight to Dr. Clark's opinion that [she] would miss work more than four times per month and that she would need more than standard work breaks during the day." (Doc. No. 12, PageID# 859.) Although Biggs does not cite any authority in support of her argument, the treating physician rule provides the relevant legal framework.

Under that rule, when the opinion of a treating physician concerning the nature and severity of a claimant's condition or RFC is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record," the ALJ must give that opinion controlling weight in her analysis. 20 C.F.R. § 404.1527(c)(2); *see also Gentry*, 741 F.3d at 727 (holding that a treating physician's opinion concerning a claimant's RFC is also entitled to deference). The rule is based on the belief that a treating source's opinion is best able "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(c)(2). An ALJ may decline to adopt a treating physician's RFC, but only if the ALJ provides "good reasons" for that decision. *Id.* Those reasons must be "supported by the evidence in the case record[ ] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

In weighing a treating physician's RFC that has been deemed non-controlling, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source, and any other relevant factors. *Gentry*, 741 F.3d at 727; 20 C.F.R. § 404.1527(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek*, 880 F.3d at 785.

The ALJ provided good reasons for not giving Dr. Clark's opinion controlling weight. The ALJ's treating-physician analysis follows her thorough summary of Biggs's treatment with Dr. Clark and Dr. Kanagasegar and her conclusion that Biggs's symptoms were controlled by that treatment. With that context, the ALJ characterized Dr. Clark's opinion that Biggs would miss

work four times a month as "extreme" and found "no evidence in the record to support the requirement of a break every two hours . . . ." (AR 23.) Further, the ALJ found that the pulmonary restrictions Dr. Clark prescribed were at odds with Biggs's history as a smoker. The ALJ concluded that these limitations were inconsistent with "the record as a whole." (*Id.*)

Biggs argues generally that Dr. Clark's "restrictions are well supported in [the] record" but fails to point to any evidence that would bolster Dr. Clark's finding that Biggs would need breaks every two hours and would likely miss work about four times each month.[11] (Doc. No. 12, PageID# 859.) Biggs emphasizes that Dr. Clark diagnosed Biggs for vitamin D deficiency, headaches, and rheumatoid arthritis; reviewed X-rays of her lumbar spine and her shoulder; referred her to Dr. Kanagasegar; evaluated her on January 18, 2016, when she had difficulty getting up to do anything; increased her medications on March 18, 2016 to control her pain and headaches; and referred her to specialists to treat her abdominal pain. (Doc. No. 12.) But Biggs does not explain how that history is relevant to Dr. Clark's opinion that Biggs would need breaks every two hours and miss work four times a month as a result of her conditions. In the absence of such explanation, the ALJ's finding that those limitations were inconsistent with the evidence in the record constitutes a good reason to decline to give Dr. Clark's opinion controlling weight. That is especially so given that the ALJ gave great weight to the parts of Dr. Clark's opinion that were consistent with the substantial evidence in the record. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) (finding it "significant[,]" in reaching the conclusion that the ALJ

---

[11] Biggs also claims, without any supporting argument or citation, "that the ALJ cherry-picked instances when Ms. Biggs showed improvement and did not consider her reports on the whole to her doctors." (Doc. No. 12, PageID# 860.) Biggs has waived this argument by failing to develop it. *See Bailey v. Colvin*, No. 3:15-cv-00815, 2016 WL 4559972, at *7 (M.D. Tenn. Sept. 1, 2016) (collecting cases for the proposition that an undeveloped argument is waived), *report and recommendation adopted by* 2016 WL 572455 (M.D. Tenn. Sept. 30, 2016).

properly rejected aspects of treating doctor's opinion, "that the [ALJ] did not reject wholesale the conclusions of [the treating doctor] and indeed incorporated [the doctor's] conclusions regarding [claimant's] limited ability to repetitively grip or grasp objects and [claimant's] overall endurance" into questions for the vocational expert).

Finally, the ALJ considered the required regulatory factors in weighing Dr. Clark's opinion. In addition to analyzing the supportability of Dr. Clark's opinion and its consistency with the record, *see* 20 C.F.R. § 404.1527(c)(3)–(4), the ALJ considered his status as an internist who provided primary care for Biggs since September 2014, *see id.* § 404.1527 (c)(2)(i)–(ii), (5). (AR 23.) The ALJ also noted that Dr. Clark "provided routine prescription refills and managed her care with specialists." (AR 23); *see also* 20 C.F.R. § 404.1527 (c)(2)(ii). Because the ALJ provided good reasons for the weight she gave Dr. Clark's opinion, she did not violate the treating physician rule.

## IV. Conclusion

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Biggs's motion for judgment on the administrative record (Doc. No. 11) be DENIED and that the decision of the Commissioner be affirmed.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 28th day of January, 2020.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge